**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DONNA DALY** | ) | |
| | ) | |
| Plaintiff, | ) | |
| **v.** | ) | Civil Action No. |
| | ) | |
| | ) | |
| **PNC BANK, N.A.** | ) | |
| | )**TRIAL BY JURY DEMANDED** | |
| | ) | |
| Defendant. | ) | **Electronically Filed** |

<u>**COMPLAINT**</u>

Plaintiff Donna Daly ("Plaintiff"), by and through counsel, brings this Complaint against PNC Bank, N.A. ("Defendant" "PNC") on the grounds and in the amounts set forth herein:

<u>**Preliminary Statement**</u>

1.      Plaintiff alleges that PNC Bank, N.A. recklessly disregarded its duties under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 s-2b(b),  by failing to conduct a proper investigation of Ms. Daly's dispute of the reporting of her mortgage equity line account with National City Bank, an entity that PNC Bank acquired.  PNC Bank continued to cause derogatory late payments to be attributed to Ms. Daly's credit report when no proper investigation of her disputes would have resulted in the reporting of the derogatory information.  Ms. Daly demands actual damages, statutory damages, punitive damages, attorneys' fees, and costs as a result of the violations of the FCRA.

<u>**Parties**</u>

2.      Plaintiff Donna Daly is a natural person.  She is a "person" and "consumer" as defined by the FCRA at 15 U.S.C. §1681a(b) and (c) because she is an

individual.  Unless otherwise specifically stated herein, the term "Plaintiff" shall refer to Donna Daly.

3.       PNC Bank, N.A. is a furnisher of information as contemplated by FCRA section 1681s-2(a) & (b), that regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies about consumer transactions or experiences with any consumer.  On October 24, 2008 PNC announced that it acquired National City Bank, and the deal closed on December 31, 2008.

### Jurisdiction & Venue

4.       This court has jurisdiction pursuant to the Fair Credit Reporting Act 15 U.S.C. 1681 *et. seq*. and 28 U.S.C. §1337.  Venue is proper in this jurisdiction and division as the Defendant is subject to personal jurisdiction in the Western District of Pennsylvania by virtue of the business that it conducted within the division.  Because the Defendant is subject to personal jurisdiction in the district and division, venue is proper in this Court.

### Factual Allegations

5.       On July 7, 2005, Albert R. Kemerer, Donna Daly, and National City Bank entered into a home equity line of credit.  Under the terms of the agreement, National City Bank established an $80,000 equity line in which Mr. Kemerer and Ms. Daly guaranteed payment.

6.       The terms of the agreement specifically obligated National City Bank to provide a monthly statement to a defined party "you" meaning each of the undersigned parties on the contract.  National City promised to identify the minimum monthly payment due on the monthly statement as the contract states:

**Statements.** *Bank agrees to mail or deliver to you a monthly statement for each billing cycle at the end of which there is a balance which is a debit or credit balance of more than $1 or on which a finance charge has been imposed.* The balance is the sum of all outstanding Advance(s), fees, payments, other credits, other charges and debits, and finance charge(s).

**Payments.**  Your payments will be due monthly.  You may pay the entire unpaid balance of your Line and/or your FRL(s) at any time.  *You are required to pay a minimum payment by the Due Date shown on your statement equal to the sum of the Line Minimum Payment and the FRL Minimum Payment for each FRL in use*.

*See* Exhibit "A" attached hereto. (emphasis added).

7.     Mr. Kemerer and Ms. Daly made sure that each monthly payment was paid as required under the terms of the contract through July 2009, and the account at that point had never been paid late.  For purposes of this lawsuit, the National City equity line account will be referred to as "the account at issue in this action."

8.     In July 2009, Mr. Kemerer was forced to file for bankruptcy protection. Mr. Kemerer knew that Ms. Daly had signed on this account, and he wanted to make sure that his bankruptcy would not affect her.  Mr. Kemerer called National City Bank in August 2009 because he had not received a monthly statement as required by the terms of the contract.

9.     When Mr. Kemerer called National City, its agent informed him that National City was required by law not to send statements or accept payments on the account while the bankruptcy proceedings were in process.   National City's representative went on to state that the account goes into "suspense" and that they could not "by law" accept any payments.

10.     As provided by the agreement, each statement that PNC was required to send was to set forth a "due date" for any payment. By putting the account into

"suspense" and by failing to send the statements as required by the agreement, PNC effectively abated or suspended the "due date" for any monthly payments.

11.     From August 2009 to November 2009, neither Mr. Kemerer nor Ms. Daly received any statement requiring payment on the account.

12.     After Mr. Kemerer's bankruptcy was discharged in November 2009, collections efforts were initiated on the account.

13.     On or about November 18, 2009, Mr. Kemerer and Ms. Daly received a telephone call indicating that they were late on payments on the account.  Ms. Daly was extremely upset upon hearing that there were late payments on the account as they were told no payments were due, and she was never sent a statement indicating the minimum monthly payment due as required by the contract.  Ms. Daly experienced a difficult and sleepless night upon hearing the news.

14.     On or about November 19, 2009, Mr. Kemerer and Ms. Daly went to their local branch in an effort to work out a solution to the problem.  They explained the entire circumstances to the branch representative, and the representative investigated the problem with the account.  At the conclusion of this investigation, the representative apologized, explained it was a communication error by the bank, and accepted a payment on the account at issue in this action that purportedly brought the account current.

15.     On November 20, 2009, Ms. Daly and Mr. Kemerer received letters from PNC Bank that were dated November 14, 2009.  The letter to Mr. Kemerer threatened to enforce the security interest on the equity line, and the letter to Ms. Daly advised her that the account was past due and required payment.  Ironically, PNC Bank had no problem

sending this separate letter to Ms. Daly when it had refused to send her monthly statements as required by the contract.

16.    Mr. Kemerer and Ms. Daly thought that they had resolved the problems with the account at issue in this action until they received another phone call from the bank a few days later stating that the problem was still not resolved.  They went back to the bank again, received another round of apologizes for PNC Bank's mistakes, and made another payment on the account.

17.    All subsequent payments were made on time for the account, and Ms. Daly thought that PNC Bank's mistakes were behind her.  This would prove not to be the case.

18.    On March 30, 2010, Equity America Mortgage Services, Inc. obtained a credit report on Donna Daly including information from Trans Union, Equifax, and Experian.  This credit report indicated that Ms. Daly was thirty days late on the account at issue in this action in September 2009, and sixty days late in October 2009.

19.    Ms. Daly was shocked to learn that despite PNC's apologies and mistakes, it had reported her as significantly past due on the equity line.  Aside from these two allegedly late payments, Ms. Daly's entire credit history demonstrates that she has never had any other account report thirty, sixty, or ninety days late on her credit report.

20.    The erroneous credit reporting resulted in Ms. Daly not being able to qualify for a new mortgage.  This fact was particularly problematic for Ms. Daly because she had recently sold her house and needed to purchase a different one by the time she closed on the sale of her house.  She immediately attempted to solve the problem by contacting PNC.

21.     On April 7, 2010, Ms. Daly wrote a letter to PNC detailing the facts and circumstances why she was not thirty days late in September 2009 and sixty days late in October 2009.  After describing in detail what happened, Ms. Daly requested that PNC Bank delete the reporting of the thirty and sixty days late notations.

22.     On April 15, 2010, PNC Bank sent Ms. Daly a response to her letter, and refused to delete the derogatory late payments from the account history.  PNC stated, "We conducted an investigation and based on the information you provided and on our information, determined that the information furnished to the consumer reporting agencies is both accurate and complete.  We have furnished information to Equifax, Experian, and Trans Union with a notation that the information is disputed."  Shocked at PNC Bank's decision, Ms. Daly sought the independent assistance of the credit bureaus.

23.     On April 13, 2010, Ms. Daly notified Trans Union, Experian, and Equifax of her dispute regarding the late payments on the account at issue in this action.  Ms. Daly detailed the circumstances and stated "I am a co-applicant on this and they stopped sending statements when the main borrow[er] filed for Bankruptcy.  They explained that they quit accepting payments in the months of the Chapter 7 bankruptcy as the file gets put in suspense.  They said they could not accept payments during this suspense per the "law".  We spoke to National City/PNC about this and they assured us that they corrected their mistakes and that my report should once again reflect paid as agreed with no lates.  Ms. Daly sent the three dispute letters via certified mail return receipt requested.

24.     On April 21, 2010, Trans Union sent a letter to Ms. Daly indicating that it completed the investigation and that they deleted the erroneous information.

25.     On April 29, 2010, Equifax sent its results of reinvestigation to Ms. Daly and stated that the creditor has verified to Equifax that the status is being reported correctly.  Accordingly, the sixty day derogatory from October 2009 and the thirty day derogatory from September 2009 remained on Ms. Daly's credit file.

26.     On May 14, 2010, Experian sent Ms. Daly a report referring her to a credit file for an update.  However, Experian also continued to report the derogatory late payment information.

27.     As demonstrated by Trans Union, any independent reasonable review of the circumstances would show that Ms. Daly should not have any derogatory late payment information regarding the account at issue in this action.

28.     On July 23, 2010, Ms. Daly sent dispute letters to Equifax and Experian on a second occasion in order to have the derogatory information removed from her account.  In these disputes letters, she stated her position regarding how the payments could not have been late because she never received a statement and that the contract for the account required her to receive a monthly statement.  Ms. Daly also included a copy of the contract with National City as additional evidence proving that the tradeline was reporting incorrectly so that there would be additional information for all parties to review as part of the reinvestigation.

29.     On July 27, 2010, Northwest Bank obtained an Experian credit file that is believed to have contained the erroneous derogatory trade line for the account that is at issue in this action.  Accordingly, Ms. Daly was unable to obtain a pre-approval certificate for a home loan.

30.     On August 12, 2010, Equifax responded with the results of its investigation. Equifax stated that it had contacted the source of the information and that additional information had been provided and that the derogatory late payments were to remain on the account.

31.     On August 12, 2010, Experian sent its results of reinvestigation and continued to report the derogatory payment information on her Experian credit file.

32.     Believing that the source of her problem, PNC Bank, could also solve her problem, Ms. Daly also applied with PNC for a mortgage loan, but she was also unable to obtain a mortgage through PNC Bank.

33.     Based upon the prevailing standards in the credit industry as a result of the mortgage crisis, Ms. Daly would be unable to obtain any loan with a sixty day derogatory trade line for a previous mortgage on her credit file as that information would cause any application to be declined either through the desktop underwriting or through Fannie Mae and Freddie Mac guidelines.

34.     PNC's failure to reinvestigate properly, Ms. Daly's FCRA disputes resulted in significant hardship, distress, and the loss of the ability to obtain credit.

**COUNT I**
**Fair Credit Reporting Act**
**15 U.S.C. 1681 s-2b(b)(1)(A)**

35.     Plaintiff incorporates paragraphs one (1) through thirty-three (33) as if fully stated herein.

36.     PNC Bank both negligently and intentionally violated the Fair Credit Reporting Act at 15 U.S.C. 1681s-2b(b)(1)(A) by failing to conduct a reasonable

investigation with respect to the disputed late payments on the account at issue in this action.

37.     PNC Bank had a duty to conduct a reasonable investigation into Ms. Daly's disputes of the late payments on the account.  No reasonable investigation would have resulted in PNC maintaining that it could report late payments on her account: 1) PNC records would have demonstrated that no monthly statement was sent for those months to Ms. Daly; 2) the terms of the contract were readily available to PNC Bank which explicitly stated that they were required to send Ms, Daly a monthly statement; 3) Mr. Kemerer and Ms. Daly attempted to avoid a problem in August 2009 by attempting to arrange for payment on the account and was told that payments could not be made and that the account would go into "suspense"; and 4) bank representatives apologizing to Ms. Daly and told that no late payments would be noted on the account when she resolved the problem in November 2009.  If any investigation had been completed, let alone a reasonable investigation, PNC Bank would never have verified to any entity that the account at issue in this action was past due in September and October 2009.

38.     At all points during its investigations of the disputes, PNC Bank had access to or actual possession of the contract, monthly statements that were issued, and all employees involved with Ms. Daly's situation that served the basis for reporting the late payments on the account.  With reckless disregard for its duties to reinvestigate the dispute, PNC continued to report that Ms. Daly was sixty days late in October 2009 and thirty days late in September 2009.

39.     PNC violated its duties to conduct a reasonable investigation on multiple occasions as Equifax stated that it notified them twice of the dispute, Experian would

have notified PNC twice, Trans Union one time, and Ms. Daly herself notified them. Despite six opportunities to report the account correctly, PNC allowed the derogatory information to remain on the credit file.

40.     Plaintiff is entitled to actual damages, statutory damages, and punitive damages based upon PNC's violations.  Plaintiff suffered damages in the form of loss of time working to correct the reporting of the inaccurate account, loss of the use of her good credit, and the emotional distress of continuing to deal with problems related to the improper reporting of derogatory credit information.

## COUNT II
## Fair Credit Reporting Act
## 15 U.S.C. 1681 s-2b(b)(1)(E)

41.     Plaintiff incorporates paragraphs one (1) through thirty-nine (39) as if fully stated herein.

42.     The Fair Credit Reporting Act at 15 U.S.C. 1681 s-2b(b)(1)(E) states, "if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly—(i) modify that item of information; (2) delete the item of information; or (iii) permanently block the reporting of that item of information."

43.     Ms. Daly disputed the reporting of the account on more than one occasion. PNC is believed to have received five automated consumer dispute verification forms or "ACDVs"  which triggered its duties to conduct a reasonable investigation as detailed above.

44.     At the time of the investigation(s), PNC Bank possessed the terms of the contract (Exhibit "A"), copies of the monthly statements issued, and access to the employees involved with Ms, Daly's problem.   The terms of the contract require a monthly statement and PNC records will demonstrate that no monthly statement was sent.

45.     Based upon the terms of the contract and the failure of PNC to issue any invoices while Mr. Kemerer's bankruptcy was pending, PNC could not verify that the account was either sixty days late in October 2009 or thirty days late in September 2009. Accordingly, PNC Bank had a duty to delete the reporting of that derogatory information.

46.     PNC Bank recklessly disregarded its duties under the FCRA to delete the reporting of the derogatory late payments because it could not verify that it sent the monthly statements to Ms. Daly in October 2009 and September 2009 as required by the contract.   In fact, PNC's agents admitted prior to the problem that the policy was not to send statements because of the bankruptcy and the account was in "suspense" and that there would be no reporting of late payments.

47.     PNC Bank intentionally violated the Fair Credit Reporting Act at 15 U.S.C. 1681s-2b(b)(1)(E) by failing to delete  the derogatory late payments reported in October 2009 and September 2009 with reckless disregard for the accuracy of the late payments that it verified.

## **Prayer for Relief**

Wherefore, the plaintiff prays that the Court award the following relief:

a)      compensatory damages against PNC ;

b)      punitive damages based upon PNC repeated violations of the FCRA;

c)      statutory damages under the FCRA

d)      interest, pre-judgment interest, costs and reasonable attorneys' fees

incurred by the Plaintiff;

e)      all other further relief that this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand trial by jury as to all issues against all defendants.

Respectfully submitted
Donna Daly

s/ James M. Pietz
By: James M. Pietz

James M. Pietz, Esq.
Pa. I.D. 55406
PIETZ LAW OFFICE LLC
304 Ross Street, Suite 700
Pittsburgh, Pennsylvania  15219
(412) 288-4333
jpietz@jpietzlaw.com

A. Hugo Blankingship, III, VSB 26424
Thomas B. Christiano, VSB 43940
Blankingship & Christiano, P.C.
1984 Isaac Newton Square, #304
Reston, Virginia 20190
(571) 313-0412
Fax:(571) 313-0582